[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiffs are candidates for the entry-level position of police officers in the Bridgeport Police Department. The defendants are the current members of the Bridgeport Civil Service Commission.
The present controversy arises out of the selection process which was initiated by the defendants in connection with the written examination for the position of police officer, conducted on July 14, 1990. The plaintiffs achieved passing scores and passed the other screening components. Their names were placed on the eligibility list to determine appointment to the position of police officer. The July 14, 1990 list was scheduled to expire on October 6, 1993. The Hon. Christine Vertefeuille restrained the list from expiring. The court's restraining order remains in effect.
The plaintiffs' complaint is directed to the method used by the defendants to determine the final selection from the eligibility list. The plaintiffs claim that the procedure used by the defendants discriminates against the plaintiffs on the basis of race and therefore violates the plaintiffs' rights under both CT Page 1492 the State and Federal Constitution.
The Bridgeport Guardians, a group of African American and Hispanic Bridgeport Police Officers, intervened in this action in support of the selection procedure employed by the Bridgeport Civil Service Commission.
The evidence introduced at trial supported the Guardians' position that racial discrimination has been rampant throughout the Bridgeport Police Department for many years.
Officer Theophilus Meekins, a twenty-seven year veteran of the Bridgeport Police Force, holds a Bachelor's Degree in Police Science and a Master's Degree in Public Administration, both granted by the University of New Haven. Officer Meekins is a charter member of the Bridgeport Guardians. Officer Meekins testified that in 1970 the police department consisted of 450 white officers and 10 black officers. Officer Meekins further testified regarding the various United States District Court decisions directed to alleviating the effects of this ingrained pattern of racial discrimination. Bridgeport Guardians, Inc. v.Bridgeport Civil Service Commission, 354 F. Sup. 778; Dobasz, EtAl v. Delmonte, 509 F. Sup. 964; Bridgeport Guardians v.Delmonte, 553 F. Sup. 601; Brown v. Bridgeport Civil Service, EtAl, No. B 86-282 (TFGD); Bridgeport Guardians v. City ofBridgeport, 735 F. Sup. 1126.
Officer Meekins testified that in 1990 there were no minorities above the rank of patrolman on the Bridgeport Police Department. Captain Arthur T. Carter subsequently testified that he was appointed the first black sergeant in 1984.
Officer Meekins concluded that recent federal court decisions resulted in changes in testing procedures that provided job opportunities for minorities that did not exist prior to the Guardians' involvement.
Captain Arthur Carter testified that he joined the Bridgeport Police Department in 1974 as a result of litigation filed by the Guardians in 1970. During his career in the department, Captain Carter was active in the Guardians organization both as an officer of the group and a plaintiff in Guardians-initiated federal lawsuits.
Captain Carter became the first sergeant, first lieutenant CT Page 1493 and now the first and only black captain in the history of the Bridgeport Police Department.
As a result of the hostile and discriminatory environment within the Bridgeport Police Department, the Court in Delmonte, supra, entered a Remedy Order requiring that discriminatory conduct be ended by the appointment of a Special Master, William Clendenen, Esq. of New Haven. Special Master Clendenen continues his work pursuant to the court's order. Captain Carter testified that he served with the Special Master during a six month period in 1990, to assist his effort to remedy discrimination within the department.
Patrolman David Daniels, III, the current Guardian President testified that a hangman's noose was placed in his car in June 1994. Officer Daniels currently has a case pending involving racial discrimination directed at him. He testified he has been ostracized from the department after reporting an incident to his supervisor that involved his seeing a rookie white police officer assaulting two black handcuffed suspects.
Evidence was introduced to show that the Special master, William H. Clendenen, Jr. Esq., threatened to suspend the Bridgeport Police Commission and impose a fine of $1,000.00 per day against the defendants, if the Commission did not take immediate remedial action concerning discrimination in connection with disciplinary hearings. The Special Master found, in a July 13, 1990 decision, that "the evidence demonstrates that minority officers are brought before the Board, when they are charged with violations of Departmental Rules and Regulations, both more frequently and more quickly than similarly situated white officers."
Captain Carter testified that he did not know of any order of either the federal court, state court or Special Master with which the department is not presently complying.
The court finds that the evidence warrants a finding that racial discrimination exists within the Bridgeport Police Department. This discrimination has resulted in federal court decisions directed at alleviating the effects of racial discrimination.
The central issue in this case is the use of "banding" as apposed to "strict rank order" in the selection of candidates CT Page 1494 from the eligibility list. The former is a procedure developed by defendants' expert, Dr. James Outtz. The latter is simply hiring candidates in the order of their test scores.
Dr. Outtz, who was the defendant's expert witness is a well qualified experienced psychologist specializing in the development of selection procedures for both public and private employers. He has had considerable experience in developing selection procedures for at least ten police departments around the country.
Dr. Outtz developed the entry level police officer examination that was administered by the City of Bridgeport in 1986.
The City of Bridgeport Charter mandated the strict rank order of selection of candidates based on their individual test scores.Brown v. City of Bridgeport, et al, Civ. No. B. 86282 (TFGD) resulted in a Stipulation, dated October 31, 1986, mandating the use of banding in the hiring of police officers from the eligibility list. Dr. Outtz testified that while strict rank order selection met the objectives of treating candidates in a standardized manner, it results in an improper use of the test: one which resulted in an adverse impact upon minority candidates. The adverse impact occurs when Black, Hispanic and female applicants who pass the test are not referred to the Police Department, because their scores are one, two or in some instances hundredths of a point below those of non-minority applicants. Use of ranked scores in this manner is improper, according to Dr. Outtz, because it ignores the fact that part of the reason for the difference between scores is simply chance, having little if anything to do with the true ability or qualifications of the applicant. Dr. Outtz testified that disparity in job performance among police officers is often less significant than written test scores might support. According to Dr. Outtz, all tests have what is calculated to be a standard error of measurement. (SEM). The more reliable the exam, the less standard of error. The less reliable, the greater the standard of error.
The SEM is used to create a bandwidth, or range of scores within which all candidates are considered to be equally qualified.
By applying, what Dr. Outtz called a standard formula found CT Page 1495 in any test on measurements, the bandwidth was calculated to be 12.92 for the July 1990 examination.
The band-width is measured from the highest score. Therefore, all candidates scoring within 12.92 points of the highest score are deemed equal in their prospective ability to perform as police officers. If the candidate with the highest score within a band is selected, the band-width, 12.92, is then measured against the remaining highest score and the band width slides downward.
This court finds that the City of Bridgeport has a compelling interest in remedying past and present discrimination. UnitedStates v. Paradise, 480 U.S. 149. This court disagrees with the plaintiffs' position as set forth in the Substituted Complaint: 12. "The defendants categorized applicants on the police officer eligibility list by race and appointed candidates in ridged adherence to an illegal race-based quota system."
The Personnel Director for the Bridgeport Civil Service Commission testified that the goal was to hire candidates who fell within the band according to their ethnic representation in the overall candidate pool. The candidate pool for the July 1990 exam numbered 887 candidates, 503 White, 184 Black, 194 Hispanic and one candidate of unknown origin. The defendants did not set a quota, which Dr. Outtz defined as setting a fixed objective for hiring irrespective of merit; i.e., "I want ten Blacks and ten Whites and ten Hispanics irrespective of merit."
The defendants' goals for hiring had a twofold purpose: first, to eliminate the disparate impact upon minority candidates through the use of banding; secondly, to provide effective policing by having racial and ethnic diversity among police officers.
The evidence was clear that banding clearly inhibits the implementation of hiring quotas. The defendants are locked into a system of selecting candidates only from within bands. If minority candidates do not score well enough to merit placement in a band, they are not hired. Merit is a factor in the hiring process. Race is not the sole determining factor as would happen in a predetermined quota system.
The current Police Chief, Thomas Sweeney, testified to the importance of diversity within the Police Department as follows: CT Page 1496
 "Basically, you want a police department that the community recognizes, is representative of all elements of the department (sic — should read, "community"), that they feel there's not discrimination either favoring or working against, not reacting to the concerns of any particular aspect of the community. There is a great need to maintain a close working relationship with all elements of the community. At this time I have grave concerns that we're under represented with the Asian community . . .
 We find that many times problems occur in the Asian community that they are very reluctant to report to us . . . We obviously have language barriers with that community with Cambodians, Laotians, Thai, Vietnamese . . .
 The Bridgeport Police Department when I arrived (in 1990) had a very strained relationship with a number of elements of the community. The Afro-American community distrusted the police department because of not only whatever the direct conflicts were on the street, our communication problems but because of some historic patterns within the department that led a lot of the Afro-American residents of the city to believe that the department discriminated against Afro-Americans". (Parenthetical material added for clarity)".
Again, excerpts from Chief Sweeney demonstrating the need to maintain a close working relationship with all elements within the community:
 "The officers are very adept on the street. And perhaps in a perfect world people would accept police officers on their face right a cross the board as police officers, but it's not a perfect world and people often will assess a police officer based on appearance, he's of the same racial group or ethnic group or a person who could speak their language, and that eases communications often times in a very tense situation and that to us is important. The officers do use that. As I said, an ideal world wouldn't be that way, but that's the reality of the world and the officers use it on the street."
This court finds that the relief sought by the plaintiffs would contradict the earlier decisions of the federal courts concerning CT Page 1497 the elimination of racial discrimination within the Bridgeport Police Department.
This court finds that the City of Bridgeport must comply with these prior decisions to develop a racially diversified police department. The equal protection rights of the plaintiffs to gain entry level positions have not been violated by the defendants' narrowly tailored hiring procedures.
For the reasons discussed above, the plaintiffs have not met the burden of demonstrating that the hiring procedure used by the defendants in administrating the 1990 exam is unconstitutional.
Judgment will enter for the defendants.
RICHARD J. TOBIN, JUDGE.